SHEPHERD *v.* TODD, executor, *et al.*

Under the facts in evidence, including the responsive matter in the answers of the defendants (this being an equitable action and discovery not having been waived), there was no error in granting a nonsuit.
November 12, 1894.

Equitable petition. Before Judge LUMPKIN. Fulton superior court. March term, 1893.

Mary E. Shepherd by her petition alleged: She is one of the children and an heir at law of Edward Harper, who on March 11, 1886, made a will and shortly afterward died. This will was afterwards probated in solemn form by Robert Todd and W. G. Harper, executors. By its terms all the real estate of Edward Harper was devised to his wife and children, and was not intended by him to be sold by his executors or in any manner interfered with by them, but that the same should be divided by his heirs among themselves at their election, or that they should remain tenants in common, as he made them by his will. The will required that the executors should give bond, and it was the manifest intention of the testator that they should do so before they entered upon the execution of the will; but without giving bond and without the consent of the heirs, some of them being minors and are yet minors and incapable of consenting, they illegally obtained letters testamentary, and thus illegally took charge of and proceeded to administer the estate. They proceeded immediately to have the estate appraised and make return, all of which was unnecessary and not warranted by the will, and the expense of which was a waste of the estate. At the December term, 1888, of the court of ordinary, they fraudulently procured an order for the sale of all the realty, on the ground that it was necessary to sell to pay debts and for distribution. The ground alleged as to distri-

bution was utterly without foundation, for the will itself had devised all the realty to the heirs as tenants in common, and it was no part of the power or duty of the executors to make division among the heirs. The ground as to payment of debts was equally false, for there was more than enough personal property to pay all of testator's debts and the necessary expense of administration. A portion of the realty embraced in the order of sale was a square acre of land in Atlanta, describing it. The executors proceeded to have this land platted and largely advertised for sale, the advertisement stating that it would be sold on the first Tuesday in February, 1889. On that day when the executors exposed the land for sale, one of the heirs, John T. Harper, bought in the whole lot for the benefit of the heirs, and no money was paid on his bid or any deed made to him. A short time afterwards the executors, still contriving to waste the estate, without readvertisement and without the consent of the heirs, sold the whole tract to one Wey at private sale for $2,500, when it was worth $5,000. In their deed to Wey the executors recited that Wey was the highest and best bidder for the premises, when in fact they knew and he knew that he was not a bidder at all at the sale and was not even there present; but he received the deed reciting that he was such bidder at the sale on the first Tuesday in February, 1889, knowing the recital was untrue and knowing that he was a purchaser at private sale, at a considerable time thereafter illegally made to him by the executors. The executors well knew that the tract was rapidly improving in value, and that if there was any necessity to sell any portion of the realty of testator, they should have sold a portion of the farm lying in the country, the value of which was not enhancing in any near ratio to that in the city. The executors were guilty of fraud, because they knew they had not given bond as required by the will, had

alleged a false ground to procure the order of sale; they knew that to sell the whole tract it would bring less than if it had been sold by the lot as platted; they knew they had no right to sell it at all, much less at private sale; they knew there was no necessity to sell the whole tract, and that in the whole transaction they were injuring the heirs and running the estate to unnecessary expense. Wey knew that the executors had not given bond as required by the will, that the order for sale had been illegally procured, that he had no right to purchase at private sale, that the tract at public sale and sold as platted would bring more than he was giving the executors, that the estate was not getting the advantage of the sale by lots as platted and advertised; and yet, knowing all this, deliberately entered into the fraud which he saw the executors perpetrating, assisted them therein and derived a large profit therefrom. He was informed by them that they did not need all the purchase money for any purpose, and he agreed to pay them only one third of the purchase price; and after all their illegal expenditures, they now have on hand two thirds of the money he paid them. Harper, one of the executors, has died, leaving Todd sole executor. Wey is in possession of the land and of the deed. Petitioner prays that Wey be required to deliver up the deed, and that he and Todd be required to show why the deed should not be cancelled and the sale set aside, and why the property should not be declared to be the property of the heirs of Edward Harper; and for general relief. Petitioner brings the petition because Todd participated in making the fraudulent deed and will not proceed to annul it.

By the first item of the will of Harper, he gave to his wife certain personalty and one eleventh of his realty, for her natural life and to be equally divided between all of her children at her death. By the second item he devised

to his children the remaining ten elevenths of his entire estate, after $100 was paid to A. J. Harper and $200 to Daisy Fish, provided he remained with the family until he was twenty-one years old. In this item he named the children he wanted the ten elevenths "divided between," after deducting the $300, among them being Mary E. Shepherd, and appointed for her as trustees William G. Harper and Robert Todd, and provided "said trustees are to take said trust fund without bond." The third and last item was: "I hereby constitute and appoint my son W. G. Harper, and Robert Todd, executors of this my last will and testament. This the 11th day of March, 1886, with bond."

After the introduction of the evidence for plaintiff, a nonsuit was granted, and plaintiff excepted. She testified : I am a daughter of Edward Harper. The land in question was sold the first Tuesday in February, 1889. I was not present at that sale. Todd told me he had sold it, and that brother John bought it in for the heirs. I never made any consent or agreement that this property be sold to Wey by John T. Harper, nor did I ever consent that the property be sold to any one. There were nine living children of my father, and one dead who had three little children. My mother is still living. There are minor children now. Father was in possession of this city property at his death. I never knew of or consented to John T. Harper transferring his bid to Wey or any one. The place had been sold some time before I heard that Wey had bought it. My property was left as trust property. I went to Rosser in 1890 to bring suit, and went to my present attorney in 1892, directly after I found that the suit had not been brought. In the conversation with Todd after the public sale, I told him I didn't think he had any right to sell the property and pay the debts, that I thought he ought to collect the money and pay the

debts.   He said he had to sell it to pay debts.   The objection I had was, that he ought to pay the debts by collecting the money, and not by selling the property, and because the property was advancing every day and should not be sold that way.   My husband had been acting for me in the matter and looking after my interest, and I had confidence in him.   Since my father's death my husband has not been looking after my interest.   Todd was looking after my interest.   My interest was left in Todd's and my brother's hands, as trust property.   My brother didn't have anything to do with it. My husband was there at that sale, and I knew he was going.   He went through curiosity to see what it brought. He did not go representing me at all.   He went because I wanted to know what they were doing; I thought he would come back and tell me, but he was not my agent or anything like that; I didn't tell him to represent me at all; he went like anybody else would go to a sale, and I expected him to tell me when he came back what they did, but I do not see what he could have done to represent me; he and I talked over what the property ought to bring, many times, and he went there with an idea as to what I wanted it to bring, but they didn't ask him.   I was expecting Todd to take care of my interest. I was very well satisfied when they bid it in for the heirs. I thought it was still ours, and did not say anything then; if the heirs had got the proceeds of the sale, I would have been perfectly satisfied, but we did not get it.   I was not satisfied with the price it brought.   If he had divided it up and we could have kept it, I would have been satisfied.   I thought he was going to divide it up.   Todd had divided it up into ten lots, and said he was going to sell it to get it out of court, and then it would be the heirs'.   It was bought in for the heirs. Todd told me that if he sold it, it would be bought in for the heirs.   The last time I was talking to him before the

sale, he told me he was not going to sell the town lot but was going to hold that for an investment for the heirs, that it was advancing in value and he was going to hold it; but the next news I got, he advertised it for sale. When I had this conversation with him, he said he was simply selling it to get the title in the heirs; that is what he said he was going to do with both places. Before the sale I told him he ought not to sell the land, that he ought to collect money and pay the debts; and he told me he was going to hold that piece. He never did tell me he was going to sell it to get money to pay the debts. Afterwards he said he did sell it to pay the debts. When I was talking to him after my brother had sold it, he said the heirs didn't pay in any money and he was obliged to have some, and he went and sold it again to get some. I never saw any of the money paid in by Wey. He said he had it in the bank. After the money came in that Wey paid, Todd told me that was all the money the estate had, and the other heirs had consented to paying the doctor's bill for my mother, over $100, out of it; and I gave consent to his paying it. I thought I could not help myself. I had been to the ordinary, and he told me that Todd held my property as trust property, and I thought Todd could do as he pleased. When the home place of my father was sold by the executor, the heirs that were of age bought it in for the heirs, and I thought it would be divided among the heirs. Some of the heirs agreed to let our mother stay there, and others did not. I did not agree, but wanted it divided up. The home place and the place bought by Wey were not sold at the same time, but the town lot was sold first. The town lot had no building on it. My father owned it for some thirty years but never improved it. He died in 1887.

The husband of plaintiff testified: I was at the sale. The lot, I suppose, is an acre. William G. Harper was

alive at the time of the sale. James Treadwell bought the property at that sale for the heirs. I suppose John T. Harper spoke to him to buy it in for the heirs. It was sold on the day it was advertised. The reason why I know it was to be bid in for the heirs, was, that there were several of the heirs there and I heard one of them say they would protect the property and buy it in for the heirs, if it did not bring enough. I was not consulted in regard to it. They just said afterwards they bought it in to protect the heirs. I never heard Todd say anything about it, but Treadwell said`he bought it in for the heirs. His bid was something like $2,200 or $2,300. I did not pay much attention to what it brought. On the day of and before the sale, John T. Harper told me, if it did not bring what they thought it ought, they would bid it in for the heirs; he never told me anything afterwards. I do not know that there was any amount mentioned as to what it should bring. I did not see Wey there that day, and he did not make any bid on the property that I know of. If Treadwell transferred his bid to Wey, we never knew anything about it. The first announcement Treadwell made as to who his bid was intended for, was just after the property was knocked off. W. G. Harper, John T. Harper, Tom Lawrence, Bill Swan and all those interested in it, and I think Todd, were present. The substance of the announcement by Treadwell was, that he had bid it in at the request of John T. Harper, for the heirs of Edward Harper. I never represented my wife as agent in any of this transaction. I was not known as her agent in this, because she had a trustee under the will of Edward Harper. I went with my wife to the ordinary, and he told us we had to leave the will as it was, and we had no say so about it. I have never been consulted in regard to the transaction. I was present at the sale because I knew it was going to be sold that day, and my wife told me

she would like for me to go up and see what it would bring. I cannot remember now what else was said in regard to it, but think I told her I thought it a very valuable piece of property; I thought that section of Atlanta was coming out. I did not go particularly for her, but out of curiosity and because I felt some interest in it as a matter of course. Tom Lawrence married one of the heirs, and Swan another. I don't know that all the heirs were there who were in the State, nor that they were all represented. I did confer and talk to those present on the day of the sale. I talked the matter over, and it was perfectly agreeable. —Lawrence testified, that to the best of his knowledge Treadwell bid off the property for the benefit of the heirs; that Shepherd was there representing his wife's interest, witness supposed, but did not know; that just after the sale, in the presence of John T. Harper, Treadwell said he bid it in for the benefit of the heirs, that Harper asked him to defend the property for the benefit of the heirs, and John T. Harper so stated afterwards; that witness was there watching the sale, but had no authority to represent his wife; that everything seemed to be perfectly satisfactory and no objection was made by anybody, but "we" did not think the property brought enough and witness heard some grumbling right there, but wasn't able to make it bring more; that witness was not recognized in the sale nor was his advice asked; that John T. Harper told him afterwards that his bid had been transferred to Wey for $2,500; that John T. Harper said, "I sold it and I have got a profit on it; I have sold it to Mr. Wey and I have a profit on it; I have got $2,500 for it"; that witness did not know that John T. Harper told him that all that went to the executor and he did not get a cent of it, supposes he did, though witness thinks he never asked him; and that the land was platted off a week or so before the sale. Plaintiff also

put in evidence the will of Edward Harper, the order of sale, and the advertisement of the sale. The order and the advertisement recited that the sale was for the purpose of the payment of debts and for distribution. The advertisement was of the land as one parcel, and the terms of sale were stated as one third cash and the remainder in six and twelve months, with interest. Attached to the petition was what purported to be a copy of the deed by the executors to Wey. It was in the ordinary form of such deeds, stated that Wey was the highest and best bidder at the public sale, and that the property was knocked off to him for $2,500.

The answer of Todd, executor, was, in brief, as follows: The lot was sold for its full value, and the sale was made at the request of many of the legatees and heirs at law, for the purpose of division, as well as to raise funds for the payment of the expenses of administration, debts of the estate, and certain specific legacies provided for in the will; all of which was well known to plaintiff and acquiesced in by her and her husband; and though the sale was made over three years before her suit was commenced, no objection to this defendant was ever made by her or any one else. Her husband was at the sale, claiming to act for her; and when an agreement was made between the heirs then present, to protect the property from being sacrificed, he demurred to running it over $1,800. Several moneyed men were at the sale, some of whom owned property adjoining this lot and some of whom bid on it, but none would bid over $2,250. The sale was open and fair, and made after a full and clear advertisement; and neither this defendant, nor his then coexecutor so far as he knows, did or said anything to chill the sale, but did all they could to realize the highest price for the lot, which they were prompted to do because it was right and because they were interested in the result,—Harper indi-

vidually, and this defendant on behalf of his wife who
was a legatee under the will. The executors platted the
land into ten lots, with the hope that it would sell for
more if so divided; they exposed for sale one or two of
these small lots, but had to bid them in; and then saw
the property would sell better as a whole, as it did not
lie in such shape as to be susceptible of advantageous
division; and then they exposed it for sale as a whole,
and the result was that it sold for its highest market
value, and was bid in by John Harper upon the promise
by the executors to give him a few days in which to ne-
gotiate a private sale, agreeing to make titles to such
purchaser for said purpose, John Harper acting for the
parties. In a very few days he closed a trade for the
lot to Wey for $2,500, which was a big price for it and
which was paid to the executors; they made titles to
Wey, and the $2,500 went into the funds of the estate,
and plaintiff had the benefit of her full share of the same
in a subsequent agreement made with the heirs and leg-
atees. Defendant denies that the executors did not give
the bond required by the will. Plaintiff with all the
other accessible heirs and legatees signed the bond as
sureties. After the death of Edward Harper, his wife
Nancy was in bad health; all his adult heirs and lega-
tees agreed to allow the rents of the home place to go
to her for her support and nursing; consequently nothing
came into the hands of the executors from rents; and
said place has since been sold by the executors under
order of the court of ordinary, and bid in by certain of
the legatees upon the agreement that it was to remain
intact so long as their mother Nancy should live, for
her support, said legatees agreeing to accept this land
and other money in the hands of the executors, as their
portion of the estate; but before the estate could be
settled up and this agreement consummated, Thomas
Laurence, a son-in-law of Edward Harper, sued the

executors on an account for extra services for nursing and attending Edward and Nancy Harper, and has recovered a verdict and judgment amounting to $400. So long as this suit is pending, the interest of the respective legatees cannot be ascertained. Defendant denies all charges of improper conduct, bad faith and fraud, both for himself and for his coexecutor, now deceased.

In the answer of Wey it is alleged, among other things, that the land in question adjoined some of his property; that he learned of the executors' sale to J. T. Harper as the highest bidder, and of the land being in the hands of Leak & Lyle, real estate agents, for sale for J. T. Harper; that he called on Leak & Lyle, and after considerable negotiation, agreed to buy the property for $2,500; that he knew nothing of any arrangements between the heirs and executors of the estate, but supposed he was buying the land from J. T. Harper, and when he discovered that no title papers had been made by the executors to said Harper, he took from Harper a written transfer of his bid, for $2,500, dated March 18, 1889, and reciting that he was to stand in Harper's place as purchaser at the sale, and four days afterwards he took from the executors their bond for title and gave them $625 in cash and his notes for the balance, which notes he paid when they matured, and on January 4, 1890, the executors made him their deed to the property; and that the price he paid was full, and was regarded as a high figure for the property at that time. He denies all allegations tending to charge him with knowledge or information of anything irregular or illegal, or that he participated in any fraudulent conduct or knew of the same, etc.

T. C. BATTLE, J. L. KEY and P. F. SMITH, for plaintiff.

PAYNE & TYE and WESTMORELAND & AUSTIN, for defendants.

Lumpkin, Justice.

Mrs. Shepherd filed an equitable petition against Todd, one of the executors of her father's estate, and one Wey, upon the trial of which action a nonsuit was granted, and she excepted. The reporter's statement sets forth, in substance, the contents of the plaintiff's petition; the evidence introduced in support of it, and the answers of the defendants. There was no waiver of discovery, and consequently these answers, in so far as they relate to facts within the knowledge of the defendants and are responsive to the allegations of the petition, are to be treated as a part of the evidence properly to be considered in passing upon the question of nonsuit, it not appearing that the responsive statements were rebutted in the manner prescribed by law. Indeed, they were not seriously disputed, in any material particular, by anything contained in the evidence of the plaintiff or of her husband. We deem it unnecessary to repeat or summarize the contents of the official report, but will content ourselves with mentioning a few of the most important facts, in view of which the judgment of nonsuit was, we think, unquestionably right.

The executor's sale took place on the first Tuesday in February, 1889. The plaintiff knew in advance that the sale was to take place, and her husband was present when it occurred. While, according to her testimony and his, he was not there representing her as agent, he nevertheless promptly reported to her all that had been done. She was informed, not only that the property had been bid off by John T. Harper, but also that the latter had transferred his bid to Wey, and that the executor had conveyed to Wey accordingly. With a full knowledge of these facts, she not only silently acquiesced in the sale, but consented to the payment by the executor of a physician's bill for her mother out of its proceeds, and also, with a full knowledge that a deed to

the land had been made to Wey and that the purchase money paid by him had gone into the hands of the executor, received the benefit of her full share in the same without objection of any kind.   The sale by the executor was fairly made; the land brought its full value; and the plaintiff, although she had consulted an attorney in 1890 with reference to instituting proceedings to set the sale aside, did not in fact begin her action until more than three years after the sale had taken place.   It also appears that Wey bought in perfect good faith and without knowledge of any complaint or objection on the part of the plaintiff or any other person interested in the estate.

Without referring more particularly to other facts appearing in the record, enough has been stated to show clearly that the plaintiff fully ratified all that was done by the executor, by John T. Harper and by Wey; and that she accepted her portion of the fruits of the transaction which resulted in a conveyance of the land to Wey, without objection and with full knowledge of all the facts.   Upon every principle of law and justice she is now estopped from attempting to set this conveyance aside.   Indeed, matters have gone so far, she would not be permitted to do this even if she offered to restore to the estate the money she has actually received and that of which she has had the benefit through the hands of the executor.                              *Judgment affirmed.*